UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

ROBERT ABRAHAMS, d/b/a                   :
TECHNOLOGY MANAGEMENT NETWORK,:

          Plaintiff,        :      Civ. Action #06-CV-4286(SRC)

    against                      :

HYGROSOL PHARMACEUTICAL CORP. : MOTION DATE: APRIL 6, 2009
and SANFORD BOLTON,
                        : ORAL ARGUMENT REQUESTED

      Defendants.

                        :

---

MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

NAGEL RICE, LLP
103 Eisenhower Parkway
Roseland, New Jersey 07068
(973) 618-0400
Attorneys for Defendants,
    Sanford Bolton and Hygrosol
    Pharmaceutical Corp.

Bruce H. Nagel, Esq.
Robert H. Solomon, Esq.
    On the Brief

## TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES.................................. ii,iii

PRELIMINARY STATEMENT.................................... 1

FACTUAL SUMMARY.......................................... 2

LEGAL ARGUMENT

    POINT I

        STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT .. 14

    POINT II

        DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT
        BECAUSE THE JUNE 5, 1996 LETTER FAILS AS
        A MATTER OF LAW TO CHANGE THE CONTRACTUAL
        RELATIONSHIP BETWEEN THE PARTIES ................. 15

            A. The June 5, 1996 Letter Addresses
               Only Ministerial Issues................... 16

            B. The June 5, 1996 Letter Did Not Form a
               Contract Because There Was No Meeting
               of the Minds........................... 20

            C. Plaintiff Never Accepted Bolton's
               Modification to the June 5, 1996
               Letter.................................... 27

            D. The June 5, 19965 Letter is Void for
               Lack of Consideration.................... 29

CONCLUSION.............................................. 32

## TABLE OF AUTHORITIES

CASES

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ..... 14

Bridgeport Pipe Engineering Co. v. DeMatteo
   Construction Co., 159 Conn. 242 (1970) ................ 22

Business Loan Center, LLC v. Nischal, 331 F. Supp.
301 (D.N.J. 2004) ......................................... 20

Cavallo v. Lewis, 1 Conn.App. 519 (1984) ................ 27

Childrens v. Joseph, 842 F.2d 689 (3d Cir. 1988) ........ 14

Geary v. Wentworth Laboratories, Inc., 60 Conn.App.
622 (2000) ................................................ 21

Hoffman v. Fidelity & Casualty Co., 125 Conn. 440
(1939) .................................................... 21

Keefe v. Norwalk Cove Marina, Inc., 57 Conn.App.
601 (2001) ................................................ 29

Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S.
487 (1941) ................................................ 20

Laidlaw, Inc. v. Student Transportation of
   America Inc., 20 F. Supp. 2d 727 (D.N.J. 1998) ........ 20

Leigh v. Smith, 138 Conn. 494 (1952) .................... 27

Marzano v. Computer Sci., 91 F3d 497, (3d. Cir. 1996) .... 14

Osbourne v. Locke Steel Chain Co., 153 Conn. 527
(1966) .................................................... 29

White v. Westinghouse Elec. Co., 862 F2d 56,
(3d Cir. 1988) ............................................ 14

Williams v. Borough of W. Chester Penn., 891 F.2d
458 (2d Cir. 1990) ........................................ 14

Zahornacky v. Edward Chevrolet, Inc., 37 Conn.Supp.
751 (1981) ................................................ 21

*Ziotas v. Reardon Law Firm, P.C.*, 111 Conn.App.
287 (2008) .......................................... 27


RULES

Fed. R. Civ. P. 12(b)6................................... 1

Fed.R.Civ.P.56(c) ...................................... 14


OTHER

<u>1 Restatement (Second), Contracts,</u> § 59 (1981)

## PRELIMINARY STATEMENT

This brief is respectfully submitted on behalf of defendants Sanford Bolton (herein "Bolton") and Hygrosol Pharmaceutical Corp. (herein "Hygrosol" or "HPC") in support of Defendants' motion for summary judgment. First, the claims of plaintiff, Robert Abrahams d/b/a Technology Management Network (herein plaintiff or "Abrahams") are barred by the express language of the contract in issue. Second, plaintiff's contention that his June 5, 1996 letter amended the agreement between the parties must fail as a matter of law because there was no mutual assent or meeting of the minds. Additionally, Bolton's response to the June 5, 1996 letter is a classic counteroffer, which was never accepted by plaintiff and thus could not be binding on the parties. Finally, the claims asserted by plaintiff must be dismissed for failure of consideration.

In the beginning of the case plaintiff filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)6. In ruling on the motion, Judge Chesler stated:

> This Court concludes that the June 5th, 1996 letter is not so unequivocal and so lacking in ambiguity as to totally preclude the possibility that the interpretation which plaintiff attaches to it is impossible. . . . The Court will note that while it is possible, to put it bluntly, the June 5th, 1996 letter would nonetheless appear to be a somewhat thin read, the court has

> merely concluded that in the absence of <u>full</u>
> <u>discovery</u> in this case, the interpretation which
> plaintiff urges is not so strained as to render
> it a total <u>impossibility</u> that the agreement
> could be construed as plaintiff asserts.
> (emphasis added)(<u>See</u> Certification of Robert
> Solomon ("Solomon Cert.") at Exhibit A, at p.
> 24, 25).

Full discovery now confirms that the Court's "thin read" analysis was correct and that plaintiff's claims must be dismissed as a matter of law.

FACTUAL SUMMARY

Plaintiff is in the business of marketing items in the pharmaceutical industry. Bolton and Spiridon Spireas ("Spireas") introduced a liquid solid system which had pharmaceutical applications and which they sought to market with potential users.

On or about October 21, 1995, Abrahams and Bolton entered into a Finders' Agreement ("Agreement") which provided <u>inter alia</u> that if Abrahams provided certain marketing services, Bolton would pay to Abrahams 5% of all revenues received by Bolton arising from licensing the specific technology set forth in the Agreement known as the "Bolton Technology". The express terms of the Agreement provided that Abrahams was entitled to his 5% <u>only if</u> he actually performed services to secure the business. <u>See</u> Agreement annexed to Certification of Robert Solomon at Exh. B. The Agreement provides in pertinent part:

8.   In the event that Bolton enters into a
binding agreement for a revenue generating
business arrangement concerning Bolton
Technology on the basis of information disclosed
by TMN, then, in accordance with the terms
hereof, and for each such business agreement
based upon information disclosed by TMN, TMN
shall be entitled to compensation for its
services . . .

(d)   The period during which TMN shall be
entitled to receive compensation shall be
coincident with that during which Bolton
realizes revenues or other considerations as a
result of the activities performed by TMN under
the terms and conditions contained herein.

*     *     *

10. Either party may terminate this Agreement
upon ninety (90) days' signed written notice to
such effect, provided that, notwithstanding any
such termination, TMN shall be entitled to all
monies as provided herein with respect to any
opportunity disclosed pursuant to this Agreement
prior to such termination . . .

(See ¶¶8 and 10 of the Agreement attached to
Solomon Cert. at Exh. B)(emphasis added).

Abrahams admits that the Agreement was not an exclusive and

that if Bolton initiated his own contact Abrahams would not be

entitled to a commission. See deposition transcript of Abrahams

at Tr:56-24 to 57-3; Tr:50-17 to 25; attached to Solomon Cert.

at Exh. C. Further, Abrahams admits that in order for him to

earn a commission, he had to do a number of things:

Q.   One of the obligations you had in order
to earn a commission was to identify a potential
business venture, correct?

A.   Correct.


Q.   Under this agreement, if you did not do
that you would not be entitled to a commission,
correct?
A.   Correct.


Q.   Second obligation you had under the
agreement was to discuss to Dr. Bolton the
identity of the potential business venture,
correct?
A.   That's correct.


Q.   If you did not do that under this
agreement you would not be entitled to a
commission, correct?
A.   Correct.


Q.   The third obligation you had was to be
instrumental in order to bring about a binding
agreement for either acquisition, license, joint
venture, development or other revenue-generating
business arrangement, correct?
A.   Correct.  With the proviso that what
instrumental role meant to one client is not
necessarily what instrumental role meant to
another.

                    *     *     *

Q.   Were you obligated under this agreement
to serve an instrumental role in bringing about
an agreement between Dr. Bolton and a third-
party, yes or no?
A.   I would get paid if I served an
instrumental role to what I felt was in my
client's best interest and I wanted – my
feeling, working in this capacity, was to be as
involved as possible because I wanted to
facilitate a deal because if there was no deal,
if my client screwed up the deal, I didn't get
any money.

                         4

See deposition transcript of Abrahams at Tr:39-20 to 40-16;

Tr:46-8 to 17; attached to Solomon Cert. at Exh. C; and See

Solomon Cert. at Exh. B, ¶ 7.

In addition, the Agreement sets forth a pro forma

procedural mechanism by which Abrahams provides Bolton with

names of potential contacts and Bolton has a limited time period

to provide a written response as to how or whether he wants

Abrahams to proceed with the contacts. The Agreement states:

> 1. TMN agrees that it shall inform Bolton,
> as appropriate, of potentially commercial
> applications for the Bolton Technology, and the
> identity of companies or other entities with
> which TMN has and/or may establish communication
> regarding Bolton Technology.

> 2. Within ten (10) days after receipt
> of such disclosure Bolton shall, in writing,
> inform TMN of his interest therein. (See ¶¶ 1
> and 2 of the Agreement attached to Solomon Cert.
> at Exh. B).

On or about December 7, 1995, Plaintiff sent Bolton a

letter, pursuant to paragraph 1 of the Agreement, listing

companies that Abrahams would attempt to pursue regarding the

liquid solid system of the Bolton Technology. (See Solomon Cert.

at Exh. D; See deposition transcript of Abrahams at Tr:49-8 to

50-5 attached to Solomon Cert. at Exh. C). In fact Abrahams

testified as follows:

> Q.    Now, in your December 7, 1995 letter
> where you identified a list of companies that

you were going to approach, you asked Dr. Bolton to sign off on it, correct?

A.    Yes

Q.    Why is that?

A.    Under the terms of the Finder's Agreement it says that, "I will inform Bolton of potential commercial applications and the identity of companies or entities which I have or may establish communication regarding Bolton technology, and within ten days after receipt of such disclosure, Bolton shall, in writing, inform TMN of his interest."

Q.    So you felt that pursuant to the terms of the agreement you would have to <u>identify</u> the potential business target and they would have to <u>approve or reject</u> that, correct?

A.    Correct.

<u>See</u> deposition transcript of Abrahams at Tr:49-8 to 25 attached to Solomon Cert. at Exh. C (emphasis added).

Abrahams set up an in person meeting on May 28, 1996 with himself, Bolton and Spireas to discuss administrative issues and a strategic plan and to learn more about the technology. <u>See</u> deposition transcript of Abrahams at Tr:51-7 to 52-5 attached to Solomon Cert. at Exh. C; <u>See</u> Certification of Sanford Bolton at ¶ 9. One of the topics raised at the meeting related to the ministerial notification provisions of paragraphs 1 and 2 of the Agreement. In specific, Abrahams, Spireas and Bolton discussed easing the process set forth in the Finders' Agreement which required having Abrahams and Bolton communicate back and forth regarding initiating contacts with potential business targets.

In other words, they discussed Abrahams not having to write a letter to Bolton each time Abrahams wanted to initiate a contact and Bolton, in turn, then having to respond to the letter. See Certification of Sanford Bolton at ¶ 9.

While many issues were addressed at the May 28, 1996 meeting, there was never any discussion regarding a material change in the Agreement to make the Agreement an "exclusive" finders' agreement, entitling Abrahams a finder's fee even if he did not perform any services as a finder amendments. Nor did Abrahams ever request that he receive a commission where he did not find the business opportunity or facilitate a deal. See Certification of Sanford Bolton at ¶ 2. According to Abrahams:

> Q.   Was there any discussion at all about that subject matter at the May 28th meeting, that is if they [Bolton and Spireas] found potential business venture on their own you would not be entitled to a commission under the Finder's Agreement.
>
> A.   I don't believe that was brought up.
>
> *   *   *
>
> Q.   Did you ask Dr. Bolton at that meeting to agree to amend the original Finder's Agreement?
> A.   Not to my recollection.
>
> Q.   When you left the meeting on May 28th did you believe that you had amended the original Finder's Agreement?
>
> A.   At that meeting I don't believe so.

See, deposition transcript of Abrahams at Tr:57-4 to 9 and Tr:65-6 to 12, attached to Solomon Cert. at Exh. C.

In fact, four days after the May 28 meeting, Abrahams continued to act as if no agreement was made to amend the Agreement and, on May 31, 1996, in accordance with paragraph 1 of the Agreement, Abrahams sent Bolton a letter listing an additional four companies which Abrahams wanted to pursue. See Solomon Cert. at Exhibit F. Bolton did not sign this letter. See, Bolton Cert. at ¶10.

Thereafter, and within the next five days, on June 5, 1996, Abrahams sent Bolton another letter attempting to memorialize the parties' agreement to simplify the letter writing obligations required by the Agreement. (the "June 5 Letter") See Solomon Cert. at Exh. G. In this letter Abrahams states:

> At the time of the meeting I held with you and Spiro Spiraes, I got the impression that it is your mutual intention to have me directly involved in all future negotiations related to collaborations pertaining to the Liquisolid Technology.
>
> If I am correct and such is to be the case, then there should be no need for us to execute a new letter each time we are presented with a new opportunity.

Bolton signed the letter but wrote by hand on this letter "With the exception of Barr Labs". Id. Abrahams never accepted the modification. See Certification of Sanford Bolton at ¶ 3.

The June 5 Letter only addressed whether Abrahams was obligated to confirm his potential leads by letter and did not in any way alter the Agreement which required Abrahams to perform services in order to receive a commission. See Solomon Cert. at Exh. G.

The June 5 Letter does not i) reference the original Agreement, ii) amend a specific paragraph in the Agreement, iii) state that Abrahams receives a commission whether or not he identifies a business target or brings a third party together with Bolton, iv) state that the manner in which commissions are generated pursuant to the Agreement is being changed, and v) state that the Agreement is an exclusive. See Solomon Cert. at Exhibit G. Abrahams never sent any written communication to Bolton at any time between June 5, 1996 and 2006 which confirms, or let alone refers to, the Agreement being an exclusive or Abrahams' entitlement to a commission regardless of his involvement in the process. See Certification of Sanford Bolton at ¶ 4. Further, Abrahams never told Bolton or Spireas at any time after June 5, 1996 that the Agreement was amended. See deposition transcript of Abrahams at Tr:72-8 to 13, attached to Solomon Cert. at Exh. C. In addition, Abrahams never told Bolton, before or after June 5, 1996, what Abrahams' intent was with regard to the June 5 Letter. See Certification of Sanford Bolton at ¶ 5. Also, Abrahams never told Bolton that he had an

exclusive finder's agreement with Bolton or that he would be entitled to a commission even where he did not introduce Bolton to the third-party. See, deposition transcript of Abrahams at Tr:104-22 to 105-12; Tr:106-9 to 24 attached to Solomon Cert. at Exh. C.

On March 7, 1998, Plaintiff sought to amend the Agreement to reflect the assignment by Bolton of all his rights to the liquid solid system of the Bolton Technology to HPC and to change the parties to the Agreement to include HPC. See Solomon Cert. at Exh. H. Bolton never signed Abrahams' requested change to the Agreement. Unlike the June 5 Letter, the March 7, 1998 proposed amendment drafted by Abrahams specifically delineates the changes to the Agreement:

FINDERS' AGREEMENT

AMENDMENT

This document will serve to amend the FINDERS' AGREEMENT, dated the twenty-first day of October 1995, by and between TECHNOLOGY MANAGEMENT NETWORK and SANFORD BOLTON to reflect (1) the formation of and the assignment by Bolton of all rights to Bolton Technology to HYGROSOL PHARMACEUTICAL CORPORATION, a Delaware Corporation with its principal place of business located at 177 Arlington Avenue, Clifton, NJ 07011 (henceforth "HPC") and (2) TMN having been reorganized as TECHNOLOGY MANAGEMENT NETWORK, LLC, a Connecticut limited liability corporation (henceforth "TMN").

> Except for these changes in name, all terms and conditions of the aforementioned FINDERS' Agreement remain in full force and effect.
>
> In recognition of the foregoing, the parties hereto sign below.

See Solomon Cert. at Exh. H.

Further, the proposed amendment to the Agreement states "Except for these changes in names, all terms and conditions of the aforementioned FINDERS' AGREEMENT remain in full force and effect." Pointedly, in describing the contractual relationship between the parties, Abrahams does not reference the June 5 Letter which, according to him, changed the entire scope and dynamic of the Agreement from a commission based on providing a service, to an exclusive commission relationship where Abrahams gets paid even where he renders no services whatsoever.

Bolton, HPC and Spireas, the co-founder of HPC, entered into a contract with Mutual in June 1998. (herein "HPC-Mutual Contract") See Certification of Sanford Bolton at ¶ 8. Abrahams claims that he learned of the HPC-Mutual Contract in November, 1998. See Solomon Cert. at Exh. I, Abrahams answer to Interrogatory #7. Abrahams admits that he had absolutely no involvement in bringing Mutual together with Bolton and Hygrosol and that he is not entitled to any monies pursuant to the Agreement. See Solomon Cert. at Exh. J, Plaintiff's responses to Request to Admit numbers 1, 2, 3, 4, 15, 16, 19, 20; See

Solomon Cert. at Exh. I, Abrahams' answers to Interrogatory #
11, 13 and 17; See deposition transcript of Abrahams at Tr:62-12
to 19 attached to Solomon Cert. at Exh. C.

Further, paragraph 8 of the Agreement provides that:

> (b) Payments due TMN shall be made by Bolton on
> or before the fifteenth day of each month for
> revenues actually received by Bolton through the
> last day of the preceding month;

> (c) TMN shall have the right to one financial
> audit per year of the financial records of
> Bolton, which records pertain specifically to
> the business opportunity for which TMN is
> responsible . . .

See Solomon Cert. at Exh. B. Despite these provisions Abrahams
never sent any written communications to Bolton inquiring as to
whether any revenues were generated from Mutual or anyone else
or his alleged exclusive agreement. See Certification of Sanford
Bolton at ¶ 6. No such communication was sent, even though
plaintiff was informed by Spireas about HPC-Mutual products
being marketed (Propafenone) and nearing approval for marketing
(Felodipine) since August 9, 2002. See Solomon Cert. at Exh. K.
Further, plaintiff wrote a letter to BTG International on
November 26, 2002 confirming his knowledge that defendants were
making money on the "liquisolid technology."

> Thus far, Hygrosol has licensed its technology
> to three drug firms for use in enhancing the
> delivery and oral bioavailability of specific
> active agents. Negotiations with other companies
> are underway. One drug utilizing the Liquisolid

<u>technology is on the market</u>; another is awaiting
<u>NDA approval.</u>

<u>See</u> Solomon Cert. at Exh. E.

In addition, Abrahams never sent any writing to anyone regarding his entitlement to commissions as to the HPC-Mutual deal. <u>See</u>, deposition transcript of Abrahams at Tr:77-4 to 11, attached to Solomon Cert. at Exh. C. Also, Abrahams never sent any written document to anyone requesting information regarding royalties that were earned by Bolton or Hygrosol in connection with the Mutual deal. <u>See</u>, deposition transcript of Abrahams at Tr:107-17 to 108-1; Tr:108-21 to 24, attached to Solomon Cert. at Exh. C. Abrahams never inquired as to whether the HPC-Mutual Contract generated any revenues to Bolton or Hygrosol. <u>See</u>, deposition transcript of Abrahams at Tr:117-16 to 24, attached to Solomon Cert. at Exh. C. Finally, despite believing that he was, in essence, a 5% owner of the company/technology, and learning, as of at least August, 2002, that defendants were making money on their liquisolid technology, Abrahams never requested the "financial audit" to which he was entitled under the Agreement. See Certification of Sanford Bolton at ¶ 7.

## LEGAL ARGUMENT

### POINT I

## STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Summary judgment must be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P.56(c). A genuine issue of fact exists "only if a reasonable jury, considering the evidence presented, could find for the non-moving party. <u>Childrens v. Joseph</u>, 842 F.2d 689,694 (3d Cir.1988 (citing <u>Anderson v Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986)).

The Court must consider all evidence in the light most favorable to the non-moving party. <u>Marzano v. Computer Sci.</u>, 91 F3d 497, 502 (3d. Cir.1996); <u>White v Westinghouse Elec. Co.</u>, 862 F2d 56, 59 (3d Cir.1988). Nonetheless, the non-moving party must "adduce more than a mere scintilla of evidence in its favor . . ." <u>Williams v Borough of W. Chester Penn.</u>, 891 F.2d 458, 460 (3d Cir. 1990). The summary judgment standard mirrors the directed verdict standard which requires the trial judge to direct a verdict if there can be but one reasonable conclusion. If reasonable minds could not differ as to the import of the evidence, a verdict should be directed and similarly, summary judgment should be granted. <u>Williams</u>, 891 F.2d at 459. Finally, the Third Circuit has characterized the inquiry as "whether the

evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 459.

Here, the evidence regarding the June 5 Letter is completely "one-sided". Plaintiff's claims amount to nothing more than an after the fact tale unsupported by common sense or the record.

POINT II

**DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THE JUNE 5, 1996 LETTER FAILS AS A MATTER OF LAW TO CHANGE THE CONTRACTUAL RELATIONSHIP BETWEEN THE PARTIES**

By the express terms of the Agreement, plaintiff would not be entitled to any monies unless plaintiff actually performed services, including the disclosure of information. See, Agreement ¶8 attached as Exhibit B to Solomon Cert. Plaintiff admits that he had absolutely no involvement in bringing Mutual together with Bolton and Hygrosol and that he is entitled to no commission under the Agreement.

To save his case from dismissal, plaintiff asserts that a letter he wrote to Dr. Bolton on June 5, 1996 changes the entire scope of the parties' contractual relationship. Plaintiff alleges that the June 5 Letter now entitles him to a commission from Bolton for any monies generated by the liquisolid technology even if plaintiff performs no services and has no

15

involvement in bringing any deal together. Providing plaintiff with all inferences under the summary judgment standard, plaintiff's claims pursuant to the June 5 Letter must fail as a matter of law.

### A. The June 5, 1996 Letter Addresses Only Ministerial Issues

The Agreement sets forth a _pro forma_ procedural mechanism by which plaintiff provides Bolton with names of potential contacts and Bolton has a limited time period to provide a written response as to how or whether he wants Abrahams to proceed with the contacts. _See_ ¶¶ 1 and 2 of the Agreement attached to Solomon Cert. at Exhibit B.

On December 7, 1995, Plaintiff sent Bolton a letter, pursuant to paragraph 1 of the Agreement, listing companies that Abrahams would attempt to pursue. _See_ Solomon Cert. at Exhibit D; _See_ deposition transcript of Abrahams at Tr:49-8 to 50-5 attached to Solomon Cert. at Exh. C. Abrahams understood this cumbersome but required procedure under the Agreement.

> Q.    Now, in your December 7, 1995 letter where you identified a list of companies that you were going to approach, you asked Dr. Bolton to sign off on it, correct?
> A.    Yes
>
> Q.    Why is that?
> A.    Under the terms of the Finder's Agreement it says that, "I will inform Bolton of

> potential commercial applications and the
> identity of companies or entities which I have
> or may establish communication regarding Bolton
> technology, and within ten days after receipt of
> such disclosure, Bolton shall, in writing,
> inform TMN of his interest."
>
> Q. So you felt that pursuant to the
> terms of the agreement you would have to
> <u>identify</u> the potential business target and they
> would have to <u>approve or reject</u> that, correct?
> A. Correct.

<u>See</u> deposition transcript of Abrahams at Tr:49-8 to 25 attached
to Solomon Cert. at Exh. C (emphasis added).

Abrahams set up an in person meeting on May 28, 1996 with
himself, Bolton and Spireas to discuss among other things
administrative issues. One of the topics raised at the meeting
related to the ministerial notification provisions of paragraphs
1 and 2 of the Agreement. <u>See</u>, Bolton Cert. at ¶9. Pointedly,
<u>nothing was discussed at the meeting</u> about whether Abrahams
would be entitled to a commission even if he did not find the
business or facilitate a deal. Nor was there any discussion
about making the Agreement exclusive, or guaranteeing Abrahams a
commission where he performed no services. <u>See</u> Bolton Cert. at
¶4. According to Abrahams:

> Q. Was there any discussion at all
> about that subject matter at the May 28th
> meeting, that is if they [Bolton and Spireas]
> found potential business venture on their own
> you would not be entitled to a commission under
> the Finder's Agreement.

> A.      I don't believe that was brought up.
>
> *      *      *
>
> Q.      Did you ask Dr. Bolton at that meeting to agree to amend the original Finder's Agreement?
> A.      Not to my recollection.
>
> Q.      When you left the meeting on May 28th did you believe that you had amended the original Finder's Agreement?
>
> A.      At that meeting I don't believe so.

See, deposition transcript of Abrahams at Tr:57-4 to 9 and Tr:65-6 to 12, attached to Solomon Cert. at Exh. C.

On June 5, 1996, Abrahams sent Bolton a letter attempting to memorialize his view of the May 28, 1996 meeting between the parties. See Solomon Cert. at Exh. G. In this letter Abrahams states:

> At the time of the meeting I held with you and Spiro Spiraes, I got the impression that it is your mutual intention to have me directly involved in all future negotiations related to collaborations pertaining to the Liquisolid Technology.
>
> If I am correct and such is to be the case, then there should be no need for us to execute a new letter each time we are presented with a new opportunity. (emphasis added).

Bolton signed the letter but wrote by hand on this letter "With the exception of Barr Labs". Id.

According to Abrahams' own testimony and the wording of the June 5 Letter, that letter only addressed the limited issue of

whether Abrahams was obligated to confirm his potential leads by letter; it did not in any way alter the commission structure under the Agreement. Indeed, the June 5 Letter specifically references the discussion at the meeting, which only dispensed with the need to execute a new letter each time Abrahams presented a new opportunity. The June 5 Letter can only be read in the context of the discussions at the May 28 Meeting. Abrahams readily admitted at deposition that, at the May 28 Meeting, there was no discussions, let alone agreement, on the subject of amending the Agreement to entitle him to a finder's fee where he rendered no services. Without even a discussion on the topic, the June 5 Letter does not serve to modify the Agreement as a matter of law.

It is undisputable that nothing was discussed at the meeting that related to: 1) plaintiff receiving an exclusive; 2) amending the Agreement to provide plaintiff with a commission even if he does not facilitate a deal; or 3) plaintiff receiving a commission if Bolton found a potential business venture on his own. As a result, it is evident that no reasonable fact finder could find that the June 5 Letter relates to these topics.

On the other hand, the topic of ceasing the ministerial acts of obtaining Bolton's approval before reaching out to speak to a potential target was specifically discussed at the meeting. It was this subject matter that is reflected in the June 5

Letter. Nothing more, nothing less. The June 5 Letter is a simple missive which eliminates a pro forma requirement under the Agreement.

As a result, the June 5 Letter does not change the basic and underlying assumptions of the Agreement: that plaintiff had to be the precipitating factor in the deal in order to entitle him to a fee. Abrahams did nothing with regard to the Mutual deal and Defendants' motion for summary judgment should be granted.

### B.   The June 5, 1996 Letter Did Not Form a Contract Because There Was No Meeting of the Minds

Under Connecticut law,[1] there must be a meeting of the minds in order for a contract to be formed.

---

[1] Here, the parties agreed that the Agreement "shall be construed in accordance with, and be governed by the laws of the State of Connecticut." See Exhibit B to Solomon Cert. at ¶14. In a diversity action, the district court applies the choice of law rules of the state in which it sits. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Business Loan Center, LLC v. Nischal, 331 F. Supp. 301 (D.N.J. 2004). "Under New Jersey law, where a contract expresses a clear intent to have a particular jurisdiction's law govern, the parties' choice of law will apply unless it violates New Jersey public policy." Laidlaw, Inc. v. Student Transportation of America Inc., 20 F. Supp. 2d 727, 750 (D.N.J. 1998). As to the straightforward issues raised in this motion - meeting of the minds, offer and acceptance, and lack of consideration - Connecticut law does not

> The rules governing contract formation are well settled. To form a valid and binding agreement contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties…To constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an identical understanding by the parties…If the minds of the parties have not truly met, no enforceable contract exists…[A]n agreement must be definite and certain as to its terms and requirements…So long as any essential matters are left open for further consideration, the contract is not complete.

Geary v. Wentworth Laboratories, Inc., 60 Conn.App. 622, 627 (2000). (Citations omitted; internal quotation marks omitted.); Zahornacky v. Edward Chevrolet, Inc., 37 Conn.Supp. 751, 753-54 (1981) ("it is a basic principle of contract law that in order to form a binding contract there must be mutual assent or a meeting of the minds. Where the parties appear to have agreed to the terms of the contract, but circumstances disclose a latent ambiguity in the meaning of an essential word, this ambiguity going to the essence of the supposed contract, the result is that there is no contract."); Hoffman v. Fidelity & Casualty Co., 125 Conn. 440, 443-44 (1939)("In order for an enforceable contract to exist, the court must find that the parties' minds had truly met. . . . If there has been a misunderstanding between the parties, or a misapprehension by

violate the public policy of New Jersey. Therefore, as to these issues, Connecticut law should apply.

one or both so that their minds have never met, no contract has been entered into by them and the court will not make for them a contract which they themselves did not make."); Bridgeport Pipe Engineering Co. v. DeMatteo Construction Co., 159 Conn. 242, 249 (1970)("To constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an identical understanding by the parties.").

It is undisputed that there was never a meeting of the minds regarding altering the Agreement. Without any discussion on the issue of converting the Agreement from a non-exclusive service based contract, to one which entitled Abrahams to a finder's fee where he performs no services, there can be no finding that the June 5 Letter altered the original deal. Simply put, granting plaintiff the benefit of all inferences, no reasonable fact finder could ever find that the parties agreed to modify the commission arrangement under the Agreement especially where it is undisputed that the subject matter was never even discussed by the parties.

The June 5 Letter does not 1) reference the original Agreement; 2) amend a specific paragraph in the Agreement; 3) amend paragraphs 8, 8(d) and 10 which specifically requires Abrahams to "perform" and "disclose . . . information" in order to receive a commission; 4) state that Abrahams receives a

commission whether or not he identifies a business target or brings a third party together with Bolton; 5) state that the manner in which commissions are generated pursuant to the Agreement is being changed; 6) set forth any consideration (benefit to Bolton or detriment to Abrahams); or 7) set forth what Abrahams has to do that he did not have to do under the Agreement in order to receive a commission.

In addition, it is undisputed that Plaintiff knows exactly what is required and the precision necessary to amend a substantive provision in the Agreement. On March 7, 1998, Plaintiff sought to amend the Agreement to reflect the assignment by Bolton of all his rights to the liquisolid system of the Bolton Technology to HPC and to change the parties to the Agreement to include HPC. See Solomon Cert. at Exhibit H. Unlike the June 5 Letter, the March 7, 1998 proposed amendment drafted by Abrahams specifically delineates the precise changes to the Agreement. A simple comparison of the two documents highlights their differences and confirms that, as a matter of law, the June 5 Letter was nothing but a routine correspondence which is similar in structure and format to the letters of December 7, 1995 and May 31, 1996 sent by Abrahams to Bolton in accordance with paragraph 1 of the Agreement.

TECHNOLOGY MANAGEMENT NETWORK

Business Development & Technology Management Consultants

Robert A. Abrahams, Ph.D.
President

175 Primrose Lane, Fairfield, CT 06432

Telephone (203) 259-3396

Fax (203) 259-0316

June 5, 1996

Dr. Sanford Bolton
67 Phelps Avenue
Crosskill, NJ 07626

Dear Sandy:

At the time of the meeting I held with you and Spiro Spireas, I got the impression that it is your mutual intention to have me directly involved in all future negotiations related to collaborations pertaining to the Liquisolid Technology.

If I am correct and such is to be the case, then there should be no need for us to execute a new letter each time we are presented with a new opportunity.

Please confirm that this is indeed the case and indicate your concurrence by signing in the space provided below and returning one copy of this letter to me for my files.

Best regards.

Very truly yours,
TECHNOLOGY MANAGEMENT NETWORK

*With the exception of Boni labs Such*

Robert A. Abrahams, Ph.D.
President

ACCEPTED BY:

_____  6/18/96
Sanford Bolton         Date

---

FINDERS' AGREEMENT

AMENDMENT

This document will serve to amend the FINDERS' AGREEMENT, dated the twenty-first day of October 1995, by and between TECHNOLOGY MANAGEMENT NETWORK and SANFORD BOLTON to reflect (1) the formation of and the assignment by Bolton of all rights to Bolton Technology to HYGROSOL PHARMACEUTICAL CORPORATION, a Delaware corporation with its principal place of business located at 177 Arlington Avenue, Clifton, NJ 07011 (henceforth "HPC") and (2) TMN having been reorganized as TECHNOLOGY MANAGEMENT NETWORK, LLC, a Connecticut limited liability corporation (henceforth "TMN").

Except for these changes in names, all terms and conditions of the aforementioned FINDERS' AGREEMENT remain in full force and effect.

In recognition of the foregoing, the parties hereto sign below.

For:                          For:
TECHNOLOGY MANAGEMENT NETWORK, LLC    HYGROSOL PHARMACEUTICAL CORPORAT.

By:_____    By:_____
   Robert A. Abrahams, President    Sanford Bolton, President

*March 7, 1998*
_____       _____
Date                          Date

---

Further, the proposed amendment to the Agreement states "Except for these changes in names, all terms and conditions of the aforementioned FINDERS' AGREEMENT remain in full force and effect." In describing the contractual relationship between the parties, Abrahams does not reference the June 5 Letter which, according to him, amended the Agreement and provided him with an exclusive commission relationship where he gets paid regardless of his role or participation. The failure of the March 7, 1998 proposed amendment drafted by plaintiff to mention or refer to

the June 5 Letter confirms that the June 5 Letter was ministerial in nature.

Moreover, for plaintiff's story to work, the fact finder would have to believe that despite the alleged new deal resulting from the June 5 Letter and plaintiff's alleged entitlement to 5% commissions on the liquisolid technology, it was reasonable for Abrahmas to <u>not take any steps</u> to either confirm the alleged new deal or inquire as to his commissions. This position defies common sense. Based on the record, no fact finder could conclude that plaintiff's claim has any merit. It is undisputed that:

- Abrahams never sent any written communication to Bolton which confirms or even refers to the Agreement being an exclusive or Abrahams' entitlement to a commission regardless of his involvement.

- Abrahams never told Bolton or Spireas at any time after June 5, 1996 that the Agreement was amended.

- Abrahams never told Bolton what his intent was with regard to the June 5 Letter.

- Abrahams never told Bolton that he had an exclusive finder's agreement with Bolton or that he would be entitled to a commission even where he did not introduce Bolton to the third-party.

- Abrahams never sent any writing to anyone regarding his entitlement to commissions as to the HPC-Mutual Contract.

- Abrahams never inquired as to whether the HPC-Mutual Contract generated any revenues to Bolton or Hygrosol.

- Abrahams never requested the "financial audit" to which he was entitled under the Agreement.

In addition, it is uncontroverted that Abrahams never sent any written communications to Bolton inquiring as to whether any revenues or royalties were generated from Mutual or anyone else or his alleged exclusive agreement. Abrahams failed to send any such communication even though he was informed by Spireas on August 9, 2002 about HPC-Mutual products being currently marketed (Propafenone) and nearing approval for marketing (Felodipine). See Solomon Cert. at Exhibit K. Further, plaintiff wrote a letter to BTG International on November 26, 2002 confirming his knowledge that defendants were making money on the liquisolid technology.

> Thus far, Hygrosol has licensed its technology to three drug firms for use in enhancing the delivery and oral bioavailability of specific active agents. Negotiations with other companies are underway. One drug utilizing the Liquisolid technology is on the market; another is awaiting NDA approval.

See Solomon Cert. at Exh. E. Knowing that defendants were generating revenues from liquisolid technology as far back as

2002, it defies any basis of fact or logic that, if plaintiff actually believed he was entitled to commissions for everything having to do with the liquisolid technology, that plaintiff would not query Bolton on this issue or demand payment. Abrahams' failure to seek his alleged commissions or simply send a letter or e-mail querying about revenues earned is conclusive proof that the June 5 Letter did not change the Agreement.

As a matter of law, the June 5 Letter did not form a contract between the parties. As a result, Defendants are entitled to summary judgment.

C.   **Plaintiff Never Accepted Bolton's Modification to the June 5, 1996 Letter**

Connecticut law regarding formation of a contract is straightforward. To have a binding contract, an offer and acceptance of that offer is required. Cavallo v Lewis, 1 Conn.App. 519, 520 (1984)("It is a basic principle of contract law that in order to form a binding contract there must be an offer and acceptance . . ."); Leigh v Smith, 138 Conn. 494, 496 (1952)(an offer and "unequivocal" acceptance is required to form a contract). Further, if the offer is rejected and a counteroffer is presented, the counteroffer must be accepted to have a contract. Ziotas v Reardon Law Firm, P.C., 111 Conn.App. 287, 304 (2008)("A reply to an offer which purports to accept it

but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counteroffer."); 1 Restatement (Second), Contracts § 59 (1981).

It is undisputed that the parties entered into the Agreement dated October 21, 1995. Plaintiff sent Bolton a letter dated June 5, 1996, which, according to plaintiff now, changed the entire scope and foundation of the Agreement. Also, according to plaintiff now, the June 5 Letter was an offer to enter into a contract to modify the Agreement. Bolton rejected the offer and presented a counteroffer when he added the language "With the exception of Barr Labs", signed the letter and returned the letter to plaintiff. Plaintiff _never_ accepted Bolton's counteroffer. Plaintiff _never_ signed the counteroffer presented by Bolton or any writing at any time accepting the counteroffer.[2] _See_ Certification of Sanford Bolton at ¶ 3. As a result of plaintiff _never_ accepting Bolton's counteroffer, the Agreement, and only the Agreement, remains in effect. Since plaintiff admittedly did not perform under the Agreement (he

---

[2] Any modification to the Agreement had to be in writing and signed by the parties. Here, the Agreement entered into between the parties states at paragraph 13" "This Agreement represents the complete understanding of the parties and may be modified or amended only in accordance with a written, signed document." _See_ Exhibit B to Solomon Cert. As a result, for plaintiff to prevail, any valid amendment to the Agreement must be in writing and signed by the parties.

failed to introduce Bolton to a third party or bring about a deal between Bolton and a third party), Defendants are entitled to summary judgment.

D.    The June 5, 1996 Letter Is Void For Lack of Consideration

All contracts must be supported by consideration. <u>Osbourne v Locke Steel Chain Co.</u>, 153 Conn. 527, 530-531 (1966)("The doctrine of consideration is of course fundamental in the law of contracts, the general rule being that in the absence of consideration an executory promise is unenforceable. In defining the elements of the rule, we have stated that consideration consists of 'a benefit to the party promising, or a loss or detriment to the party to whom the promise is made'"); <u>Keefe v Norwalk Cove Marina, Inc.</u>, 57 Conn.App. 601, 606 (2001).

Here, the June 5 Letter fails because it was not supported by consideration. According to plaintiff, the June 5 Letter entitled him to 5% of all revenues generated from the Bolton Technology regardless of plaintiff's involvement or participation. However, this "promise" is not supported by any benefit to Bolton or detriment to plaintiff.

29

The Agreement provides as follows:

> TMN shall undertake all of the activities it deems necessary <u>to serve an instrumental role</u> in order to bring the parties into a business relationship.

<u>See</u> Exhibit B to Solomon Cert. at ¶7. (emphasis added). Consistent with his contractual obligation, plaintiff admitted at deposition that, under the Agreement, he was required to put all his effort into facilitating a deal between Bolton and a third party.

> Q.   Were you obligated under this agreement to serve an instrumental role in bringing about an agreement between Dr. Bolton and a third-party, yes or no?
>
> A.   I would get paid if I served an instrumental role to what I felt was in my client's best interest and I wanted – my feeling, working in this capacity, <u>was to be as involved as possible</u> because I wanted to facilitate a deal because if there was no deal, if my client screwed up the deal, I didn't get any money.

<u>See</u> deposition transcript of Abrahams at Tr:46-8 to 17, attached to Solomon Cert. at Exh. C. (emphasis added).

Under the Agreement, plaintiff was required to play an "instrumental role" in the process and plaintiff testified that he understood that to mean that he was to "be as involved as possible." As a result, with regard to the Agreement, plaintiff was to commit <u>100% effort</u>. As to the June 5 Letter, since the

plaintiff already agreed to give Bolton full effort, Bolton was receiving nothing in return for plaintiff getting a 5% commission on all revenues regardless of plaintiff's involvement. In other words, the June 5 Letter added no additional obligations on plaintiff or benefits to Bolton. No detriment to plaintiff or benefit to Bolton – thus no consideration.

In addition, the June 5 Letter contains no mention of any consideration or what benefit Bolton was receiving in exchange for providing plaintiff with a 5% interest in defendants' technology. Without this necessary information, the June 5 Letter completely lacks clarity and must fail.

Since the June 5 Letter lacks consideration, it fails as a matter of law. As a result, Defendants are entitled to summary judgment.

## CONCLUSION

For all of the foregoing reasons, Defendants' motion for summary judgment should be granted and plaintiff's complaint should be dismissed with prejudice.

Respectfully submitted,

ROBERT H. SOLOMON

Dated: February 24, 2009